IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA,                                                          PLAINTIFF,

v.                                                                CIVIL ACTION NO. 3:18-cv-444-HTW-LRA

$99,980.00 UNITED STATES CURRENCY,                              DEFENDANT PROPERTY.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America, by and through its United States Attorney and the undersigned Assistant U.S. Attorney for the Southern District of Mississippi, brings this Verified Complaint for Forfeiture *in rem,* in accordance with Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("the Supplemental Rules") and the Federal Rules of Civil Procedure, and alleges as follows:

## NATURE OF THE ACTION

1.  This is an action by the United States seeking forfeiture of $99.980.00 United States Currency (the "defendant property") seized from J. Jesus Encarnacion Flores Ojeda.  The defendant property is subject to forfeiture under 21 U.S.C. § 881 and 18 U.S.C. §§ 981(a)(1)(A) and (C) because the defendant property is involved in or constitutes the proceeds of drug trafficking and was being transmitted by courier, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), 18 U.S.C. § 1956(a)(1) (money laundering), and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses).

## THE DEFENDANT IN REM

2.  The defendant property consists of $99.980.00 United States Currency, which was seized by the U.S. Drug Enforcement Administration on January 29, 2018, in Morton, Mississippi, within the Southern District of Mississippi, Northern Division.

1

## JURISDICTION AND VENUE

3. This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture *in rem* under 28 U.S.C. § 1355.

4. Venue is proper in the Northern Division of the Southern District of Mississippi pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1395(a), because the acts and/or omissions giving rise to the forfeiture occurred in this district and/or pursuant to 28 U.S.C. § 1395(b), because the defendant property was found and seized in this District.

## BASIS FOR FORFEITURE

5. The defendant property is subject to forfeiture under 21 U.S.C. § 881 and 18 U.S.C. §§ 981(a)(1)(A) and (C) because the defendant property is involved in or constitutes the proceeds of drug trafficking and was being transmitted by courier, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), 18 U.S.C. § 1956(a)(1) (money laundering), and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses).

6. The Controlled Substances Act, 21 U.S.C. § 801, *et seq.,* and 21 U.S.C. § 881 make subject to forfeiture to the United States any proceeds derived, and any facilitating property, from any knowing violation of 21 U.S.C. §§ 841(a)(1), 846, and 848, which is drug distribution, drug conspiracy and continuing criminal enterprise.

7. Title 18, United States Code, Section 981(a)(1)(A) makes subject to forfeiture to the United States any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.  Title 18, United States Code, Section 981(a)(1)(C) makes subject to forfeiture to the United States any property, real or personal, which constitutes or is traceable to a violation of any offense constituting

"specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense.

8. Both 21 U.S.C. § 881(h) and 18 U.S.C. § 981(f) provide that all right, title, and interest in property described in 21 U.S.C. § 881(a) and 18 U.S.C. § 981(a) shall vest in the United States upon commission of the act giving rise to forfeiture under 21 U.S.C. § 881 and 18 U.S.C. § 981.

## FACTS AND CIRCUMSTANCES

9. A detailed account of the facts and circumstances of the search and seizure at issue and the basis for this instant forfeiture action is set out in the Declaration of DEA Special Agent Kimberly A. Dearman, attached hereto as Exhibit "A" and fully incorporated herein by reference.

## CLAIM FOR RELIEF

10. Plaintiff United States requests that the Clerk of Court for the U.S. District Court for the Southern District of Mississippi issue an Arrest Warrant *in rem* for the arrest of the defendant property under Supplemental Rule G(3)(b), which the United States will execute upon the defendant property located in the custody of the DEA under 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

11. Plaintiff United States prays that process issue to enforce the forfeiture of the defendant property and that all persons having an interest in the defendant property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant property to the United States for disposition according to law and that this Court grant the United States such further relief as this Court may deem just and proper, together with the costs and disbursements in this action.

**RESPECTFULLY SUBMITTED**, this the 9th day of July, 2018.

                                  UNITED STATES OF AMERICA

                                  D. MICHAEL HURST, JR.
                                  United States Attorney

By:       */s/  Marc. A. Perez*
            MARC A. PEREZ
            Assistant United States Attorney
            WA Bar Number 33907
            501 E. Court Street, Suite 4.430
            Jackson, Mississippi 39201
            (601) 965-4480 Voice
            (601) 965-4409 Fax
            Email: Marc.Perez@usdoj.gov

## VERIFICATION

I, Kimberly A. Dearman, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration (DEA), that I have read the foregoing Verified Complaint for Forfeiture *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint for Forfeiture *in rem* are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States of America, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a DEA Special Agent.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated this the 9th day of July, 2018.

_____
KIMBERLY A. DEARMAN
Special Agent
Drug Enforcement Administration

State of Mississippi
County of __Hinds__

Sworn to and subscribed before me, this day the 9th day of July, 2018.

_____
NOTARY PUBLIC

My commission expires: _____

5

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**DECLARATION IN SUPPORT OF VERIFIED COMPLAINT**

Under 28 U.S.C. § 1746, I, Kimberly A. Dearman, Special Agent, Drug Enforcement Administration ("DEA"), United States Department of Justice, make the following unsworn declaration, under the penalty of perjury, pertinent to the above-styled and numbered case:

### I.    Introduction

1. This declaration is made in support of a Verified Civil Complaint for forfeiture of property seized pursuant to a valid traffic stop. There is probable cause to believe that the property is involved in or constitutes the proceeds of drug trafficking and was being transmitted by courier, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), 18 U.S.C. § 1956(a)(1) (money laundering), and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses), and is therefore subject to forfeiture under 21 U.S.C. § 881(a) and 18 U.S.C. § 981(a)(1)(A) and (C). This declaration is based upon my personal knowledge and experience obtained as case agent in the above case and information I have received from other law enforcement officials.

### II.   Declarant's Background and Experience

2. I have been employed by the DEA for approximately 26 years and currently work in the Jackson District Office, where I investigate criminal and civil violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*. I have received specialized training in laws relating to the enforcement of the Controlled Substances Act and have testified in judicial proceedings for violations of the Controlled Substances Act.

**EXHIBIT A**

3. Since my assignment as a DEA Special Agent, I have participated in debriefing dozens of defendants, informants, and witnesses who had personal knowledge about narcotics, narcotics trafficking, and methods of narcotics distribution. I have participated in all aspects of a drug investigation, including conducting surveillance, executing search warrants, executing arrests, working with confidential informants, and using court-ordered eavesdropping devices. As a result of my assignment, and by virtue of my employment as a law enforcement officer, I have performed and continue to perform various duties, which include but are not limited to:

> a. Working in an undercover capacity to purchase drugs from wholesalers of illegal narcotics;
>
> b. Working as a surveillance agent to detect and record movement of persons known to be or suspected of being involved in illegal drug trafficking; and
>
> c. Working as a case agent, directing investigations of various illegal drug traffickers and their organizations, and investigations involving complex conspirators in which numerous drug traffickers, located in various states and foreign countries, were illegally importing, possessing, and distributing illegal drugs within the United States.

4. Through training and experience, and through the training and experience of other narcotics agents with whom I have talked, I have learned the following:

> a. That criminal organizations, including large-scale drug traffickers, maintain and handle large amounts of United States currency in order to finance their ongoing illicit businesses;
>
> b. That it is common practice for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in locations within their residences, vehicles, and/or place of business to conceal them from law enforcement authorities;
>
> c. That persons involved in large-scale drug trafficking conceal in their residences, vehicles and businesses caches of drugs, large amounts of currency, and evidence of financial transactions relating to the obtaining and

**EXHIBIT A**

secreting of large sums of money acquired from engaging in narcotics-trafficking activities;

d. That it is a common practice for large-scale drug traffickers to travel to distribution areas to facilitate their trafficking; that after purchasing drugs, the drug trafficker will transport, or cause to be transported, drugs to other areas for distribution; and that the methods of transportation include, but are not limited to, rental and private automobiles;

e. That traffickers use vacuum-sealed bags, tape and/or rubber bands to bundle their illegal proceeds for transport back to Mexico or source destinations. By vacuum sealing the money, drug traffickers attempt to make it difficult for law enforcement K9 units to detect trace amounts of illegal drugs, which have touched the drug proceeds and by vacuum sealing and/or using tape to package the proceeds, it condenses the package of bulk currency, allowing it to be more easily concealed.  The bundled cash may be concealed in clothing or luggage or hidden in mechanical or electronic traps within the vehicle, depending on the sophistication of the smugglers' organization.  When the currency is bundled by rubber bands, it is common for the bundles to be in thousand dollar increments;

f. That money couriers, individuals specializing in the transportation of money rather than narcotics, take a percentage of the illegal proceeds that they transport;

g. That, as a general rule, illegal drugs are transported from Mexico into the United States, while drug proceeds are transported from the United States into Mexico;

h. That couriers for drug traffickers continually buy, trade, and sell vehicles in an attempt to elude law enforcement; that couriers believe by obtaining a newly registered vehicle, any past wrongdoings or information obtained by law enforcement will not be found; that couriers' vehicles often have a "lived in look" due to long trips with few stops; that this "lived in look" can consist of excessive amounts fast food wrappers, open and unopened soft drinks or water bottles, energy drinks, an ice chest, etc.; and that in some cases, courier vehicles display pictures or statues of Saint Malverde, commonly known as the "narco saint," a folklore hero to narcotic distributors and smugglers;

i. That it is common practice for drug traffickers to pay their couriers based on the type and amount of narcotics and/or the amount of narcotics proceeds transported; and that because new couriers are not normally trusted with bulk currency or bulk narcotics, if a courier is found in possession of

**EXHIBIT A**

bulk currency or narcotics, it is often an indicator that the courier is well established and trusted within an organization;

j.      That couriers for drug trafficking organizations often use multiple cellular phones. Much like continually changing vehicles and registrations, couriers and drug traffickers believe changing cellular phones will help elude law enforcement;

k.      That it is common for couriers to cross the border of Mexico prior to and after transporting narcotics and/or narcotic proceeds; and that often couriers enter Mexico to have the narcotics loaded into the "traps" or hidden compartments; on the return trip, the traps often contain proceeds from the sale of narcotics;

l.      That drug-sniffing dogs are trained to alert to the smell of methyl benzoate, a compound formed when cocaine hydrochloride hydrolyzes in moist air;

m.      That although humans' sense of smell is not as strong, humans can often detect a distinct chemical smell in the presence of cocaine. I recognize this smell from previous seizures, including cases where laboratory results confirmed that the substance was cocaine; and

n.      That the Courts have recognized unexplained wealth is probative evidence of criminal violations by pecuniary gain, in particular trafficking in controlled dangerous substances (*see United States v. Barnes*, 604 F.2d 121, 147 (2 Cir. 1979)).

### III.    Items to be Forfeited to the United States of America

**$99,980.00 U.S. Currency, seized on January 29, 2018, from J. Jesus Encarnacion Flores Ojeda**

### IV.    Facts and Circumstances

5.      At approximately 12:30 p.m., on January 29, 2018, on Interstate 20 West in Morton, Mississippi, Hinds County Sheriff's Department Investigator Lafayette Martin[1] stopped a red Nissan pickup truck with a Tamaulipas, Mexico, license plate (WN8268) for

---

[1] Investigator Martin was working in Morton under an agreement with the Morton Police Department.

**EXHIBIT A**

careless driving.[2]  The truck's driver, Roman Perez VILLASENOR, was accompanied by passenger J. Jesus Encarnacion FLORES Ojeda.  The vehicle was registered to VILLASENOR.  Martin initially approached the vehicle from the driver's side to request a driver's license from the driver of the vehicle.  After obtaining VILLASENOR's driver's license, Martin requested, in English, that VILLASENOR exit the vehicle so that the traffic violation could be explained, and for Martin's safety.  During the stop, Martin noticed that both men exhibited signs of extreme nervousness, including breathing heavily and shaky hands.  Additionally, when Martin asked VILLASENOR in English if he was headed to Mexico, due to the vehicle's Tamaulipas, Mexico registration, VILLASENOR immediately took a step back.

6. Although VILLASENOR seemed to understand English—by complying with Investigator Martin's requests and making appropriate responses when Martin requested VILLASENOR's and FLORES' driver's licenses, when Martin asked VILLASENOR to exit the vehicle, and when Martin explained the traffic violation to VILLASENOR—once Martin asked if VILLASENOR and FLORES were headed to Mexico, VILLASENOR began speaking in Spanish and acting as if he did not understand English.  Martin believed VILLASENOR was acting as if he did not speak English in an attempt to keep a language barrier in place.  When Martin approached FLORES and asked for identification, FLORES clearly stated in English, "driver's license."  While Martin waited on FLORES to provide a

---

[2] Investigator Martin observed that the truck failed to maintain the right travel lane, veering off the roadway and hitting the "rough treads."  (Rough treads are on most U.S. Highways just outside the normal travel lanes and are used to get a driver's attention if the vehicle is drifting off the roadway).  The rough treads near mile marker 75 are approximately 20 inches outside the Interstate 20 Westbound travel lane.  As a result of the observed traffic

**EXHIBIT A**

driver's license, Martin observed FLORES' hands shaking and FLORES breathing heavily. Martin asked FLORES where he was coming from. After taking a deep breath, FLORES said "Uhhh," and took a long pause as if he was unsure, and quickly stated, "Atlanta!" Before Martin could reply, FLORES took another deep breath and tried to make an additional statement. Martin believed FLORES' behavior indicated deception, where a person will give too much information in an attempt to convince an officer that the person is telling the truth and to get their story out quickly.

7. Investigator Martin asked VILLASENOR for consent to search the vehicle, but VILLASENOR appeared to have shut down his ability to communicate in English. As a result, Martin called Hinds County Sheriff's Department Sgt. Juan Chapa (a Task Force Officer at the DEA Jackson District Office who speaks fluent Spanish), so that Chapa could speak to VILLASENOR in Spanish to avoid any potential language barriers. At Martin's request, through Chapa speaking Spanish over the phone, VILLASENOR consented to a search of the truck. FLORES was separated from VILLASENOR when VILLASENOR gave consent to search the vehicle, which was registered and owned by VILLASENOR, but FLORES did not object during the search. The stop was video and audio recorded. During the search of the vehicle, Martin found several large bundles of U.S. Currency wrapped in rubber bands and hidden inside an empty box of cookies in plain view on the back floorboard. Martin also found a black plastic bag containing five bundles of U.S. Currency wrapped in black duct tape under the front passenger seat. Martin found the currency an estimated one minute from the start of the search. Martin notified Chapa of the currency and

violation, Martin ultimately issued a warning citation to VILLASENOR.

**EXHIBIT A**

Chapa headed to the scene to assist Martin. Determining that reasonable suspicion existed that VILLASENOR and/or FLORES were engaging in or had engaged in unlawful activities, Chapa told Martin to deploy a K-9 on the vehicle to determine if the odor of narcotics was present in the vehicle.

8. Investigator Martin used his K-9, Dex (who has been specially trained in narcotics detection, apprehension and tracking) to perform an exterior open-air search for the odor of narcotics on or in the truck. As soon as Martin let Dex out of the police vehicle, Dex immediately gave a positive response for the odor of the narcotics emanating from the truck. At this point, Martin called the DEA Jackson District Office for assistance with the seizure of the U.S. Currency. After arriving on scene, Sgt. Chapa briefly talked with VILLASENOR and FLORES. Chapa then took custody of the U.S. Currency and transported it to the Hinds County Sheriff's Department Special Operations Office. Martin and FLORES followed Chapa to the Special Operations Office, with FLORES riding—unhandcuffed—in the front seat of Martin's patrol vehicle, while VILLASENOR drove his truck to the Special Operations Office. Although they were asked to come to the Special Operations Office voluntarily in order to investigate the circumstances of the seized U.S. Currency, neither VILLASENOR nor FLORES were under arrest.

9. Chapa, acting in his capacity as a DEA Task Force Officer, separately interviewed—in Spanish—VILLASENOR and FLORES. Chapa observed that VILLASENOR was nervous during the interview, and that VILLASENOR claimed no knowledge of the currency while FLORES was calmer during the interviews.

**EXHIBIT A**

10. VILLASENOR stated that he and FLORES crossed into Laredo, Texas, from Nuevo Laredo, Mexico, on Saturday, January 27, 2018, and drove to McAllen, Texas, to place a down payment on commercial vehicles that FLORES had purchased. After their stop, they headed to Houston, and then toward Virginia via Interstate 10, to look at more commercial vehicles. VILLASENOR said that once they arrived in Atlanta, Georgia, FLORES began to have trouble obtaining funds to purchase additional vehicles; therefore, they decided to turn around and travel to Dallas, Texas, via Interstate 20. VILLASENOR was unable to explain in detail FLORES' financial troubles and distanced himself by saying that he did not get into FLORES' financial business. VILLASENOR then said that he and FLORES arrived at an unknown hotel in an unknown town in Mississippi on the night of January 28, 2018, and paid for a room. VILLASENOR said that they left the hotel at approximately 10:30 a.m. on January 29, 2018, to travel to Dallas, Texas, intending to look for additional commercial vehicles to purchase despite FLORES' alleged financial troubles. VILLASENOR said that he was unaware of the currency hidden in the vehicle and had no knowledge of how the currency got inside the vehicle.

11. FLORES stated that he and VILLASENOR both crossed on Saturday, January 27, 2018 from Nuevo Laredo, Mexico to Laredo, Texas. FLORES said that after crossing into the United States at Laredo, Texas, VILLASENOR drove him to Pharr, Texas[3] to purchase multiple commercial vehicles. FLORES claimed that he placed a $28,000.00 down payment for the vehicles. FLORES could not provide the name of the dealership where the vehicles were purchased, and did not produce a receipt showing his down payment.

---

[3] Pharr, Texas, is a suburb of McAllen, Texas (where VILLASENOR said they

**EXHIBIT A**

FLORES said that VILLASENOR and FLORES then went to a mobile home trailer located in a "yard" that FLORES owned to obtain currency in the amount of $100,000.00; however, FLORES was unable to provide an address or even a street to identify the location of the "yard." Furthermore, even though the alleged purpose of their trip was to purchase commercial vehicles for FLORES' business, FLORES was initially unable to provide the name of his business. After the conversation moved on, FLORES blurted out "Trucks and Boxes" as the name of the company. FLORES said that after they collected the $100,000.00, he and VILLASENOR then began to travel toward Virginia to look at more commercial vehicles. FLORES was unable to provide any details on the travel route from Texas to Atlanta, Georgia, however. FLORES said that he and VILLASENOR turned around in Atlanta due to snowy weather forecasted for the East Coast. Afterward, FLORES said they traveled to an unknown town in Mississippi and rented a room at an unknown hotel around 10:00 p.m. on January 28, 2018. FLORES said that on January 29, 2018, he and VILLASENOR began traveling toward Dallas, Texas, going from town to town looking for commercial vehicles to purchase. FLORES denied any financial troubles and claimed that the currency found in the cookie box and under the seat belonged to him. FLORES said that he hid the money in the cookie box so that if someone broke into the vehicle, the cookie box would be less appealing to the burglar. FLORES also stated that the currency was bundled in tape to compress the currency into smaller packages and to make it easier to conceal.

12. At the Special Operations Office, I cut open the black duct-taped packaging to expose the U.S. Currency and immediately noticed an extremely strong chemical odor of

---

went first); the two towns are less than five miles apart.

**EXHIBIT A**

cocaine emitting from the bundles. Investigator Martin and Sgt. Chapa, who were across the room, also smelled the same odor.

13. I found the following receipts in VILLASENOR's truck: a Love's receipt from 135 Hwy 44, Encinal, Texas, which was dated January 19, 2018; a Home Depot receipt from 5710 San Bernardo Avenue, Laredo, TX, which was dated January 24, 2018, at 4:45 p.m.; a LaredoTrade receipt from P.O. Box 7019, Laredo, Texas, which was dated January 25, 2018, at 5:29 p.m.; an IBM ATM receipt from 1302 Guadalupe Street, Laredo, Texas, which was dated January 26, 2018, at 8:57 p.m.; a Shell receipt from 8264 Boyd Cooper, Montgomery, Alabama, which was dated January 28, 2018, at 1:28 p.m.; and a Hampton Inn receipt from 103 U.S. Hwy 11 and 80, Meridian, MS, showing check in on January 27, 2018, at 11:18 p.m. with a departure date of January 29, 2018.

14. I photographed the truck, the U.S. Currency and the documents found inside the truck. VILLASENOR and FLORES were not arrested. When VILLASENOR and FLORES were released, agents returned VILLASENOR's truck to him.

15. On February 6, 2018, the Hinds County Sheriff's Department requested that the DEA Jackson District Office adopt the seizure, and provided a State of Mississippi Turnover Order to facilitate the Federal Adoption. On February 8, 2018, a DEA Chief Counsel Senior Attorney approved the adoption of this matter.

16. On February 13, 2018, TFO Chapa delivered a cashier check transferring the $99,980.00 from the Hinds County Sheriff's Department's account to the DEA Jackson District Office. The cashier check was delivered to the U.S. Marshal Office on the same day so that the DEA could move forward with forfeiture proceedings.

**EXHIBIT A**

17. VILLASENOR does not have a criminal history; however, further investigation revealed FLORES as an associate of a drug trafficking organization under investigation by DEA Laredo. It is believed that this drug trafficking organization coordinates shipments of controlled substances from Mexico and launders U.S. Currency throughout the United States.

V. **CONCLUSION**

18. Based upon my training and experience, I concluded that probable cause existed for the traffic stop of VILLASENOR on January 29, 2018, and that VILLASENOR was lawfully stopped for a traffic violation. VILLASENOR consented to a search of his truck. During the search of the truck, Investigator Martin found several bundles of U.S. Currency wrapped in rubber bands and hidden inside an empty box of cookies, which was in plain view on the back floorboard. Martin also found a black plastic bag containing five bundles of U.S. Currency wrapped in black duct tape under the front passenger seat. I and two other law enforcement officers smelled a strong chemical odor of cocaine from at least one of the bundles of U.S. Currency wrapped in black duct tape. FLORES, the only occupant of the vehicle who claimed knowledge of the U.S. Currency, claimed that the money was for his own business, but did not know the name or address of that business. Both VILLASENOR and FLORES gave implausible travel plans for their trip in the United States.

19. I believe, based on the above-listed facts and circumstances, that there is probable cause to seize and forfeit FLORES' $99,980.00 in U.S. currency. I reasonably believe that the money was intended to facilitate or used to further a drug crime, or is directly

**EXHIBIT A**

related to drug proceeds of FLORES or his associates, all in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), and was being transmitted in violation of 18 U.S.C. § 1956(a) (money laundering) and 18 U.S.C. § 1960 (unlicensed money transmitting businesses), and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881(a) and 18 U.S.C. § 981(a)(1)(A) and (C).

20.   I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this 5th day of July, 2018.

Kimberly A. Dearman
Special Agent
Drug Enforcement Administration

**EXHIBIT A**

JS 44 (Rev. 12/07)  **CIVIL COVER SHEET**  3:18-cv-444-HTW-LRA

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
United States of America

### DEFENDANTS
$99,980.00 United States Currency

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Hinds County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Marc A. Perez, U.S. Attorney's Office
501 East Court Street, Suite 4.430, Jackson, MS 39201 (601) 965-4480

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 120 Marine | 310 Airplane / 362 Personal Injury - Med. Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product Liability / 365 Personal Injury - Product Liability | [X] 625 Drug Related Seizure of Property 21 USC 881 | | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander / 368 Asbestos Personal Injury Product Liability | 630 Liquor Laws | **PROPERTY RIGHTS** | 450 Commerce |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | 640 R.R. & Truck | 820 Copyrights | 460 Deportation |
| 151 Medicare Act | 340 Marine / **PERSONAL PROPERTY** | 650 Airline Regs. | 830 Patent | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability / 370 Other Fraud | 660 Occupational Safety/Health | 840 Trademark | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle / 371 Truth in Lending | 690 Other | | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability / 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | 810 Selective Service |
| 190 Other Contract | 360 Other Personal Injury / 385 Property Damage Product Liability | 710 Fair Labor Standards Act | 861 HIA (1395ff) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | | 720 Labor/Mgmt. Relations | 862 Black Lung (923) | 875 Customer Challenge 12 USC 3410 |
| 196 Franchise | | 730 Labor/Mgmt.Reporting & Disclosure Act | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | 740 Railway Labor Act | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | 441 Voting / 510 Motions to Vacate Sentence | 790 Other Labor Litigation | 865 RSI (405(g)) | 892 Economic Stabilization Act |
| 220 Foreclosure | 442 Employment / **Habeas Corpus:** | 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations / 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 894 Energy Allocation Act |
| 240 Torts to Land | 444 Welfare / 535 Death Penalty | **IMMIGRATION** | 871 IRS—Third Party 26 USC 7609 | 895 Freedom of Information Act |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment / 540 Mandamus & Other | 462 Naturalization Application | | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other / 550 Civil Rights | 463 Habeas Corpus - Alien Detainee | | 950 Constitutionality of State Statutes |
| | 440 Other Civil Rights / 555 Prison Condition | 465 Other Immigration Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
21 U.S.C. 881 and 18 U.S.C. 981(a)(1)(A) and (C)
Brief description of cause:
Civil forfeiture of $99,980.00 United States Currency seized from J. Jesus Encarncion Flores Ojeda

### VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes  [X] No

### VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: 7/9/2018
SIGNATURE OF ATTORNEY OF RECORD: /s/ Marc A. Perez

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____